RECORD NO. 14-1698

In The

# United States Court of Appeals
### For The Fourth Circuit

## HUNTINGTON INGALLS INDUSTRIES, INC.,
### f/k/a Northrup Grumman Shipbuilding, Inc.,

*Petitioner*,

**v.**

## RICKY N. EASON; DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR,

*Respondents.*

### ON PETITION FOR REVIEW FROM THE BENEFITS REVIEW BOARD

──────────────

### BRIEF OF PETITIONER

──────────────

Jonathan H. Walker
MASON, MASON, WALKER & HEDRICK, PC
11848 Rock Landing Drive, Suite 201
Newport News, Virginia  23606
(757) 873-3909

*Counsel for Petitioner*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __14-1698__     Caption: __Ricky N. Eason v. Huntington Ingalls Incorporated__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Huntington Ingalls Incorporated, formerly known as Northrop Grumman Shipbuilding, Inc.__
(name of party/amicus)

_____

who is _____the appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☑ YES ☐ NO

2.   Does party/amicus have any parent corporations?   ☑ YES ☐ NO
     If yes, identify all parent corporations, including grandparent and great-grandparent corporations:
     presently Huntington Ingalls Incorporated, (insurer name is Huntington Ingalls Industries, Inc.)
     formerly Northrop Grumman Shipbuilding, Inc., Northrop Grumman, Inc.

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO
     If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: _____    Date: _____ July 29, 2014 _____

Counsel for: Appellant _____

## CERTIFICATE OF SERVICE
****************************

I certify that on _____ July 29, 2014 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____          _____ July 29, 2014 _____
(signature)                              (date)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................. iii

STATEMENT OF APPELLATE JURISDICTION .................................................1

STATEMENT OF THE ISSUE...................................................................2

STATEMENT OF THE CASE...................................................................2

    Statement of Facts................................................................2

    Statement of Procedural History.................................................6

SUMMARY OF ARGUMENT ...............................................................10

ARGUMENT ...............................................................................11

    I.    Standard of Review........................................................11

    II.   Congress Designed The Longshore Act To Compensate
         Scheduled Injuries Under the Schedule (By The Fixed Payment
         of Presumed Wage Loss) And To Compensate Unscheduled
         Injuries by Paying Actual Wage Loss Benefits.  At MMI, the
         two forms of compensation were designed to be mutually
         exclusive ............................................................12

         A.    A Brief History of Providing Compensation for Loss of
              Use Under a Schedule ...............................................13

         B.    The Legislative History of the Act makes clear that
              Congress never intended to allow a claimant to recover
              benefits for an actual loss of wage earning capacity
              AFTER recovering benefits for a presumed loss of wage
              earning capacity under the Schedule ........................................16

i

C.   The PEPCO Decision Precludes an award of temporary partial disability benefits after, and in addition to, compensation paid under the Act's Schedule ..........................18

III.   This Court Has Consistently Refrained From Obviating the Clear Holding in PEPCO ....................................................22

IV.   The Ninth Circuit's Decision In *Benge* Is Legally And Factually Distinguishable And In Any Event Contrary To Law .......................27

V.   A Trend Toward Liberalizing and Extending Benefits To Injured Workers Cannot Be Accommodated Judicially When the Act Was Not So Designed............................................................30

CONCLUSION ........................................................................33

ADDENDUM

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

## <u>TABLE OF AUTHORITIES</u>

<div align="right"><b><u>Page(s)</u></b></div>

### <u>CASES</u>

196 U. S. App. D. C., at 421, 606 F.2d, at 1328 .......................................................31

*Director, OWCP v. Berkstresser*,
    921 F.2d 306, 24 BRBS 69 (CRT) (D.C. Cir. 1990), *rev'g in part,*
    *Berkstresser v. Washington Metropolitan Area Transit Authority*,
    16 BRBS 231 (1984), *rev'd on other grounds,*
    22 BRBS 280 (1989) ....................................................................7

*Director, OWCP v. Newport News Shipbuilding & Dry Dock Co.*,
    514 U.S. 122 (1995)......................................................................12

*Gilchrist v. Newport News Shipbuilding and Dry Dock Co.*,
    135 F.3d 915 (4th Cir. 1998) .......................................21, 22, 24, 25

*Henry v. George Hyman Constr. Co.*,
    724 F.2d 65 (D.C. Cir. 1984).........................................................7

*Morrison-Knudsen Constr. Co. v. Director, OWCP*,
    461 U.S. 624 (1983).....................................................................32

*Pacific Ship Repair & Fabrication, Inc. v. Director, OWCP.*,
    687 F.3d 1182 (9th Cir. 2012) .......................................... 8-9, 27, 28

*Parklands, Inc. v. Director, OWCP*,
    877 F.2d 1030 (D.C. Cir. 1989).....................................................12

*Potomac Electric Power Co. v. Director, OWCP*,
    449 U.S. 268 (1980)...............................................................*passim*

*Rowe v. Newport News Shipbuilding and Dry Dock Company*,
    193 F.3d 836 (4th Cir. 1999) .......................................21, 22, 24, 25

*Welch v. Texas Dep't of Highways & Public Transp.*,
 483 U.S. 468 (1987)...................................................................26

*Zapata-Haynie Corp. v. Barnard*,
 933 F.2d (4th Cir. 1991) ...........................................................11

## STATUTES

33 U.S.C. §§ 901, et seq...........................................................*passim*

33 U.S.C. § 908(c)(21)...............................................................29

33 U.S.C. § 919(c) .......................................................................1

33 U.S.C. § 919(d) .......................................................................1

33 U.S.C. § 921(b)(3)....................................................................1

33 U.S.C. § 921(c) .......................................................................2

## REGULATIONS

20 C.F.R. § 801.2(a)(10) ..............................................................1

20 C.F.R. § 802.201 .....................................................................1

## OTHER AUTHORITIES

1 Larson's Workers' Compensation Law § 2.08 ......................................14

4 Larson's Workers' Compensation Law § 87.03 ........................15, 30, 31

4 Larson's Workers' Compensation Law § 87.04 ............................15, 31

Achilles Geerts, et al., *Compensation for Bodily Harm:
A Comparative Study* (1977).........................................................14

Carrol D. Wright, *Compulsory Insurance in Germany:
Fourth Special Report of the Commissioner of Labor*
(U.S. Printing Office 1878)...........................................................14

H.R. 12006, § 7, 92d Cong., 1st Sess. (1971)...........................................................17

H.R. 15023, § 7, 92d Cong., 2d Sess. (1972), reprinted in Longshoremen's
and Harbor Workers' Compensation Act: Hearings before the Select
Subcommittee on Labor of the House Committee on Education and Labor,
92d Cong., 2d Sess. (1972) ........................................................................17

H.R. Rep. No. 1767, 69th Cong., 2d Sess. (1927) ......................................32

Sameul N. Kramer, *History Begins at Sumer* (3d ed. 1988)....................................13

S. 2318, § 7, 92d Cong., 2d Sess. (1971), reprinted in Longshoremen's
and Harbor Workers' Compensation Act Amendments of 1972:
Hearings before the Subcommittee on Labor of the Senate Committee
on Labor and Public Welfare, 92d Cong., 2d Sess. (1972) .....................................17

S. Rep. No. 92-1125 (1972) .......................................................................32

## BRIEF OF PETITIONER

Huntington Ingalls Incorporated appeals to this court as the Petitioner-Employer, and respectfully seeks to apply the established precedent of the United States Supreme Court in *Potomac Electric Power Co. v. Director, OWCP*, 449 U.S. 268 (1980) ("PEPCO") and of this court, to prohibit the double recovery of indemnity benefits under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq., and specifically, the payment of *additional* temporary partial disability benefits after permanent partial disability benefits have been claimed and paid pursuant to the Longshore Act's section 8(c)(1)-(20) Schedule.

## STATEMENT OF APPELLATE JURISDICTION

This appeal arose from a decision and order issued under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq., ("the Act"). Under Sections 19(c) and 19(d) of the Act, an Administrative Law Judge has jurisdiction to resolve disputes regarding a maritime workers' workers' compensation claim. 33 U.S.C. §§ 919(c)-(d). The Benefits Review Board has jurisdiction to hear appeals "raising a substantial question of law or fact taken by any party in interest from decisions with respect to claims of employees under this Act." 33 U.S.C. § 921(b)(3); 20 C.F.R. §§ 801.2(a)(10), 802.201.

This Honorable Court has jurisdiction to review the final orders of the Board under Section 21(c) of the Act, which provides:

> [A] person adversely affected or aggrieved by a final order of the [Benefits Review] Board may obtain a review of that order in the United States Court of Appeals for the circuit in which the injury occurred, by filing in such court within sixty days following the issuance of such Board order a written petition ....

33 U.S.C. § 921(c).

This Circuit includes the Commonwealth of Virginia, where all events pertinent to this litigation occurred. The Board's decisions of December 19, 2012 and May 16, 2014 constitute final Agency orders under Section 21(c) of the Act. The Employer has filed a timely petition for review, within the allotted 60 days. This Court has the required jurisdiction to conduct appellate review of the Board's decision.

## STATEMENT OF THE ISSUE

Whether the precedent of the United States Supreme Court and of this Court holds that a worker who receives benefits under the Act's section 8(c)(1)-(20) Schedule for permanent partial disability, is entitled to no subsequent, concurrent, or additional compensation for wage earning capacity.

## STATEMENT OF THE CASE

### Statement of Facts

The Claimant-Respondent, Ricky Eason, injured his right knee at work on September 28, 2008. (JA 16, 136, 177, 180). Following arthroscopic surgery (JA 138, 177), his physician treated him conservatively, with therapy and light duty work restrictions (JA 141, 180). By June 29, 2009, the Claimant had improved to

2

the point that his physician medically released him to return to his regular duty, pre-injury work activity (JA 142, 144, 182).

After two months of returning to work, the Claimant reported that his right knee continued to feel sore "every now and then." (JA 143, 182). Dr. Hoang told the Claimant to continue his activity "as tolerated" and referred him for evaluation to assign a permanent impairment rating to the right leg (JA 145), which was performed on September 23, 2009 (JA 146-47).

On October 26, 2009, Dr. Hoang assigned a permanent loss of use, final impairment rating of 14% to the right lower extremity (JA 147, 182) and directed the Claimant to "continue with activity as tolerated." (JA 143, 182). The Claimant was discharged with a direction to be seen for palliative follow up care once every three months and "to give us a call if there are any problems in the meantime," in which case steroid injections would be considered as a therapeutic intervention (*Id.*). The Claimant did not follow up in three or even six months (JA 182).

Accordingly the ALJ held that by October 26, 2009, the Claimant had reached "maximum medical improvement" ("MMI") with a permanent loss of use to the right lower extremity equating to a 14 percent loss of use. (JA 181-84). At that point, *in addition to* the regular duty wages he was now receiving for working, the Claimant would receive $992.29 per week for the next 40.32 weeks, based upon

3

his permanent partial disability under section 8(c)(2) of the Act's Schedule (JA 181).

No party presently disputes the first ALJ's factual determination that the Claimant' knee injury had reached permanency and therefore maximum medical improvement or "MMI" as of October 26, 2009, by which time the Claimant had ceased the need for more than palliative care, and therefore became entitled to compensation for his permanent partial disability under the Act's Schedule.  (JA 182-83).

The Claimant did not, after October 26, 2009, follow up with his physician three months later, or even six months later, and in fact did not report any further problems until seven months later, when he mentioned that his right knee would get stiff every now and then after sitting too long, but that now his "**left** knee" was "acting up on him."  (JA 143, 180).[1]

---

[1]  The Claimant had left knee problems dating back even further, to an injury claimed in 2005 (JA 154-59).  Thus, the reason for future wage loss actually had nothing to do with the right knee injury claimed!

From May 19, 2010 through August 9, 2010,[2] the treating physician as a precautionary measure restricted the Claimant to sedentary work activity (JA 75-78, 181, 183) and his supervisor unfortunately could not accommodate those work restrictions. Dr. Hoang performed an MRI of the left knee, which did not show any new or acute injury, but rather left knee osteoarthritis (*Id.*). Again, on July 16, 2010, the left knee presented with arthritic symptoms, whereas the right knee (the injured knee in issue) was reportedly "doing well" (JA 148, 180).

The Claimant continued to receive permanent partial disability compensation based upon his claimed injury under the Schedule for the presumed loss of wage earning capacity of 40 and 2/7 weeks;[3] nevertheless, the Claimant decided to claim the *additional* 11 and 5/7 weeks of compensation based upon his actual loss of wage earning capacity from May 19, 2010 through August 9, 2010.

During the 11 and 5/7 weeks period between May 19, 2010 and August 9, 2010, the Claimant did not have a total loss of wage earning capacity in the open

---

[2] The right knee restrictions were written to end on August 20, 2010 (JA 78), but the Claimant returned to work on August 10, 2010 (JA 18, 97, 215), and claimed compensation from May 19, 2010 until August 9, 2010 (JA 12, 18, 23, 181, 193). When reversing the first ALJ, the Benefits Review Board and second ALJ erroneously awarded compensation from May 19, 2010 until August 20, 2010 (JA 18, 202).

[3] His permanent partial disability compensation of $992.29 per week under the Act's permanent partial disability Schedule extended, despite his concurrent actual wages, for 40 and 2/7 weeks from October 16, 2009 until July 25, 2010 (JA 173, 181, 187 n.1).

labor market – but instead only a partial loss, because work was otherwise available in the local labor market for which he qualified vocationally if he had chosen to perform it (JA 200-01).

**Statement of Procedural History**

An ALJ denied the claim for an additional 11 and 5/7 weeks of benefits, based upon the Claimant having reached MMI by October 26, 2009 (JA 182-83), by which time:

1.  The Claimant had been for four months medically cleared to perform his regular duty work activity;

2.  The Claimant had consistently presented with normal physical findings clinically;

3.  The Claimant had been essentially released from all but palliative care, and only then, if such care was deemed to be needed;

4.  No further surgical intervention was contemplated;

5.  Palliative care was given to the right knee only incidental to left knee complaints; and

6.  The Claimant was assigned by his treating physician a permanent partial disability rating of 14% to the right lower extremity.

Maximum medical improvement – the time at which no further medical improvement is deemed probable – separates temporary from permanent disability,

not total from partial disability. *Director, OWCP v. Berkstresser*, 921 F.2d 306, 24

BRBS 69 (CRT) (D.C. Cir. 1990), *rev'g in part Berkstresser v. Washington*

*Metropolitan Area Transit Authority*, 16 BRBS 231 (1984), *rev'd on other grounds,*

22 BRBS 280 (1989).

The ALJ correctly held that the "Act presumes that the scheduled award fully

compensates claimant for any [future] loss in wage-earning capacity." (JA 184)

(*citing PEPCO*, 449 U.S. at 268; *Henry v. George Hyman Constr. Co.*, 724 F.2d 65

(D.C. Cir. 1984).

In this case, the award presumed 40 2/7 weeks of wage loss (after the date of

MMI); and yet, the Claimant only incurred 11 and 5/7 weeks of actual loss! The

ALJ therefore properly concluded that "any temporary loss of wage earning

capacity Claimant suffered [after the date of MMI] is not compensable in addition

to the scheduled award." (*Id.*).

The Claimant appealed the ALJ's finding that the Claimant had reached

maximum medical improvement. The Claimant specifically argued that an

insufficient weight of evidence existed to establish that he had in fact reached

maximum medical improvement before incurring the 11 and 5/7 weeks of lost wage

earning capacity between May 19, 2010 and August 9, 2010 (JA 187).

The Benefits Review Board held that the ALJ had correctly assigned

maximum medical improvement to the date of October 26, 2009; however, the

Board *sua sponte* vacated the ALJ's determination on a wholly different ground, maintaining that despite the U.S. Supreme Court's clear holding in *PEPCO*, a claimant should be entitled as a matter of law – *in addition* to the presumed loss of wage earning capacity for his Scheduled injury – to compensation for **any** future temporary loss of wage earning capacity that follows the date of maximum medical improvement (JA 188-89).[4]

The Benefits Board directed the parties and the Office of Administrative Law Judges to a decision of the United States Circuit Court of Appeals for the Ninth Circuit, in which the court permitted a claimant to recover, subsequent to the date of MMI, temporary total disability benefits for the loss of wage earning capacity *in addition* to compensation previously paid not under the Act's Schedule – but rather for actual loss of wage earning capacity under section 8(c)(21) of the Act. *Pacific*

---

[4] The Board's holding treats Scheduled disability compensation as it existed for years prior to the Court's holding in *PEPCO*. It returns Scheduled disability compensation to serving as no more than a statutory windfall that accrues for having a scheduled injury and rating. The Board holds, contrary to the intent of Congress, and contrary to the U.S. Supreme Court's longstanding precedent in *PEPCO,* that a worker with a Scheduled disability is entitled to any and all compensation that a worker with an unscheduled disability would otherwise obtain, as long as he can say he is temporarily worse or better after reaching MMI. The longstanding concept of a waxing and waning permanent impairment that has otherwise plateaued (MMI) will give way to waves alternating semantically between "temporarily improving" and "temporarily worsening" allowing dual recovery and allowing wage loss compensation to be continuously claimed, even after MMI has been reached, and the statutory fee schedule has been paid!

*Ship Repair & Fabrication, Inc. v. Director, OWCP [Benge]*, 687 F.3d 1182 (9th

Cir. 2012).

Based upon the Ninth Circuit's reasoning in *Benge* – that a Claimant could

somehow be both permanently partially disabled by an injury and temporarily

totally disabled by the injury at the same time, the Board held that the Act's

provision of a presumed loss of wage earning capacity engendered by an award of

compensation under the Schedule did not preclude – as a matter of law – additional

compensation benefits, which were always awardable for the subsequent loss of

wage earning capacity, even though permanency and maximum medical

improvement had been reached, and even though an award for permanent partial

disability under the Act's Schedule had been paid. (*Id.*).

Because the Board in this case had essentially determined the Claimant's

compensation entitlement on appeal, a second ALJ was compelled to award benefits

based upon the Board's determination. (JA 192-203). The ALJ on remand held

that the Claimant was only partially disabled, however, and therefore awarded him

in addition to the full compensation paid for 40 and 2/7 weeks under the Act's

Schedule for permanent partial disability at a weekly rate of $992.29, compensation

for 10 and 5/7 weeks of temporary partial disability compensation at a weekly rate

of $845.82 (JA 202).

9

The Employer was required to appeal again through the Board to this Court, essentially asking the Board to reconsider its determination, which the Board declined to do. (JA 209-17). The Employer argued that PEPCO at its very essence precluded an award of temporary partial disability benefits, or any other loss of wage earning capacity benefits, *after* the date of MMI and an award of Scheduled disability compensation. (JA 216). The Board erroneously reiterated that the "PEPCO [decision] does not preclude an award for additional temporary partial disability benefits [after MMI] due to the worsening of a claimant's work injury, despite employer having paid in full permanent partial disability benefits under the schedule." (*Id*.).

This appeal timely ensued.

## **SUMMARY OF ARGUMENT**

Congress intended a claimant to receive under the Act – *after* the payment of compensation for a presumed loss of wage earning capacity under the Act's Schedule – NO additional compensation for subsequent temporary partial disability based upon the actual loss of wage earning capacity. The United States Supreme Court in its PEPCO decision acknowledged the historical evidence of this Congressional intent and prevented the Agency's attempt to create or follow a judicial trend to the contrary.

The Supreme Court held in *PEPCO* that the LHWCA provided no election of remedies or additional remedies for a scheduled injury once adjudged to be permanent – the Act's Schedule provided the *exclusive* recovery under the Act for the loss of wage earning capacity attributable to a Scheduled injury once permanency, and therefore MMI, had been reached. This Court has repeatedly upheld that holding in other cases.

No basis exists in this case to step so far backwards from the decision in *PEPCO* as to ignore its essential holding and obvious application in this case. History is destined to repeat itself. As at the time of the *PEPCO* decision, the Benefits Review Board seeks again to fashion a trend toward double indemnity that contradicts the intent of the Act's designers, and that in the absence of legislative change to the Act, has no legal basis. The decision of the Benefits Review Board in this case cannot be permitted to abrogate the *PEPCO* decision, and should accordingly be vacated, and the ALJ's original decision reinstated.

## ARGUMENT

### I.    Standard of Review.

This Court reviews the Board's decisions for errors of law and to ascertain whether the Board adhered to its statutorily mandated standard for reviewing the Administrative Law Judge's factual findings. *Zapata-Haynie Corp. v. Barnard*, 933 F.2d, 258 (4th Cir. 1991). This Court owes no deference to either the ALJ or to

11

the Benefits Review Board on issues of law. *Parklands, Inc. v. Director, OWCP*, 877 F.2d 1030, 1035 (D.C. Cir. 1989) (*citing Potomac Electric Power Co. V. Director, OWCP,* 449 U.S. 268, 279 n. 18 (1980)).

The legal determinations of the ALJ and Board are reviewed by this Court *de novo*, including the standard they apply to determine entitlement to Section 8(f) relief. *Director, OWCP v. Newport News Shipbuilding & Dry Dock Co.* [*Harcum*], 514 U.S. 122 (1995).

> **II.     Congress Designed The Longshore Act To Compensate Scheduled Injuries Under the Schedule (By The Fixed Payment of Presumed Wage Loss) And To Compensate Unscheduled Injuries by Paying Actual Wage Loss Benefits.  At MMI, the two forms of compensation were designed to be mutually exclusive.**

No question exists that a medical impairment – once it becomes permanent – will continue to wax and wane by its nature, and that temporary changes for the worse are part of that condition.  In this case, the worker experienced such a flare up or temporary exacerbation of his underlying permanent condition.

The fundamental question presented is whether a worker who has reached maximum medical improvement – a medical/legal term employed in scheduled injury cases to delineate the point in time after which payment under the Schedule is due and future wage loss is presumed, may later claim additional temporary disability in order to obtain greater benefits than Congress provided under the Schedule.

The law for 34 years since the decision in *Potomac Electric Power Co. v. Director, OWCP (PEPCO)*, 449 U.S. 268 (1980) has been quite clear – that a worker who is permanently partially disabled by a scheduled injury and therefore entitled to benefits under the Act's Schedule, is not entitled to additional benefits for a subsequent temporary loss of wage earning capacity – the Schedule was specifically designed to compensate the worker for his future loss of wage earning capacity.  The Court in *Potomac Electric Power Co. v. Director, OWCP (PEPCO)*, 449 U.S. 268 (1980) flatly prohibited the Department of Labor from awarding cumulatively greater wage loss benefits than the Schedule, by its very nature, was intended to provide.

> **A.    A Brief History of Providing Compensation for Loss of Use Under a Schedule.**

The concept of paying fixed compensation for workplace injuries dates to 2050 B.C. when the law of Ur-Nammu provided compensation for the loss of, and even fractures to specific body parts.[5]  Compensation schedules prevailed through thousands of years as the only form of compensation to exist among early civilizations, and prevailed until the advent of a more complex, wage replacement

---

[5]  Samuel N. Kramer, *History Begins at Sumer* (3d ed. 1988).

13

system, first appearing as a socialist response to the industrial revolution in Germany and then later, in England.[6]

Whereas the only question under a scheduled disability compensation system was the degree of medical "impairment" or functional loss to a given body part,[7] the more complex focus in any wage replacement compensation system turns to the economic effect of impairment – the concept of "disability" from work and from earning wages – and it extends beyond any list of body parts to all medical impairments flowing from work-related injuries and disease processes.

In 1893, the United States Department of Labor prepared a report designed to encourage adoption of workers compensation laws in the United States, entitled, Compulsory Insurance in Germany.[8] This report eventually influenced Congress to pass the first workers compensation system in America in 1908, covering workers involved in interstate trade. (*Id.*).

By 1920, all but eight states had adopted state workers' compensation laws. 1 Larson's Workers' Compensation Law § 2.08. In almost every jurisdiction, both methods of compensation – fixed compensation for "scheduled" injuries, and wage

---

[6]   Achilles Geerts, et al. *Compensation for Bodily Harm: A Comparative Study* (1977).

[7]   E.g., wage loss was presumed and therefore irrelevant to the inquiry.

[8]   Carrol D. Wright, *Compulsory Insurance in Germany: Fourth Special Report of the Commissioner of Labor* (U.S. Printing Office 1878).

replacement for "non-scheduled" injuries – could be found to co-exist, as intended, quite independently of each other. *See* 4 Larson's Workers' Compensation Law §§ 87.03-04. The basic structure made sense – if an injury were covered under the Schedule, it would be easily, quickly, and certainly compensated; and if the injury were to an un-scheduled body part it would still be compensated, but only upon predicated proof of an actual loss of wage earning capacity.

In 1972, the National Commission on State Workmen's Compensation Laws, which Congress created under the Occupational Health and Safety Act of 1970, recommended that radical reforms be applied to all state workers' compensation laws – legislatively, if necessary; however, even by the standards of the U.S. Department of Labor, the changes they proposed had represented an extreme liberalization of workers compensation benefits and coverage throughout the United States. (*Id.*)

Among the changes recommended in 1972 were to abrogate the exclusion in issue (e.g., to permit the recovery even after permanency of both wage replacement and scheduled disability benefits); to eliminate any exemptions to coverage, to extend compulsory coverage to all workers; to provide all available medical services for treatment of injuries without monetary limitation; and to eliminate arbitrary limits on the duration or total sum of benefits recoverable. (*Id.*).

Within only a few months of the Commission's 1972 report, Congress amended the Longshore and Harbor Workers' Compensation Act in such a way as to adopt most of the Commission's recommendations. (*Id.*). One change that Congress did not make, however, was to abrogate the scheduled injury exclusion.

B. **The Legislative History of the Act makes clear that Congress never intended to allow a claimant to recover benefits for an actual loss of wage earning capacity AFTER recovering benefits for a presumed loss of wage earning capacity under the Schedule.**

The Board's holding in this case obviates both judicial precedent and legislative intent by permitting compensation for temporary partial disability compensation *after*,[9] in addition to the benefits paid under Act's Schedule.

The legislative history of the LHWCA establishes that Congress originally intended for the Schedule to be the exclusive compensation for an injury that is covered by the Schedule and that has become permanent in nature. The Schedule was designed to preclude the recovery of benefits for actual or hypothetical wage loss in any case involving a scheduled injury, after, or in addition to, or (as in this

---

[9]   The Employer does not dispute that until permanency is established, and entitlement to compensation is established under the Act's 8(c) Schedule, that temporary total disability under section 8(a) or temporary partial disability under section 8(e) of the Act is recoverable. The dispute is with regard to the subsequent, additional recovery or temporary total or temporary partial disability benefits once permanency is established and benefits are sought and recovered under the section 8(c)(1)-(20) Schedule.

16

case) cumulatively with, the benefits that are recoverable under the 8(c) Schedule, absent specific statutory revision of the Act.[10]

In 1972, Congress therefore considered but failed to pass an amendment to § 8(c) of the Act that would have permitted an employee after being adjudged as having reached maximum medical improvement and after the expiration of the all payments made under the 8(c) Schedule to subsequently recover additional unscheduled disability benefits for a loss wage-earning capacity. *See* S. 2318, § 7, 92d Cong., 2d Sess. (1971), reprinted in Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972: Hearings before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 92d Cong., 2d Sess., 7 (1972); H.R. 12006, § 7, 92d Cong., 1st Sess. (1971), and H.R. 15023, § 7, 92d Cong., 2d Sess. (1972), reprinted in Longshoremen's and Harbor Workers' Compensation Act: Hearings before the Select Subcommittee on Labor of the House Committee on Education and Labor, 92d Cong., 2d Sess., 27, 38 (1972).

---

[10] The future loss of earning capacity is *presumed* in any scheduled rating award, and therefore is not dependent upon a showing of actual loss of wage earning capacity. The practical irony in that case is that the Claimant's 14 percent permanent impairment rating award *presumed* under section 8(c)(2) of the Act a total future loss of 40 and 2/7 weeks of wages, when his *actual* wage earning capacity loss at the time of this litigation was only the 10 and 5/7 weeks he claimed (and by the decision below received) as additional compensation. Thus, unlike the claimant in *PEPCO*, the Schedule award to the Claimant in this case had already produced, in reality, a windfall in the form of the fixed compensation that he had been receiving each week in addition to the actual wages he had continued to earn!

17

No statutory amendment was ever made to allow claimants to supplement their Scheduled awards of permanent partial disability compensation with additional compensation for the subsequent loss of wage earning capacity, and the same should not be permitted by this court to be accomplished through the administrative judiciary. In this case, the entitlement to *cumulative* remedies is at issue, rather than the *alternative* election of statutory remedies, making the legal answer even more compelling. Congress simply did not intend wage loss benefits to be recoverable in any case involving a scheduled injury, after, or *in addition to*, or in conjunction with the benefits recoverable under the Schedule, absent specific statutory revision of the Act.

### C.    The PEPCO Decision Precludes an award of temporary partial disability benefits after, and in addition to, compensation paid under the Act's Schedule.

Under the Act, compensation for a permanent partial disability must be determined in one of two ways. If the injury is of a kind specifically identified in the schedule set forth in §§ 8(c)(1)-(20) of the Act, the injured employee is entitled to receive two-thirds of his average weekly wages for a specific number of weeks, regardless of whether his earning capacity has been impaired. In "all other cases," § 8(c)(21) authorizes compensation equal to two-thirds of the difference between the employee's pre-injury average weekly wages and his post-injury wage-earning capacity, during the period of his disability.

18

In *Potomac Electric Power Company v. Director*, 449 U.S. 268, 14 BRBS 363 (1980) ("PEPCO"), the claimant sought benefits under the Act for his loss of wage earning capacity *as an alternative to* the benefits provided by the Act's Schedule for permanent partial disability. The claimant in that case therefore argued before the Supreme Court that the amendments discussed above had shed little light upon Congressional intention with respect to *alternative* remedies under the LHWCA, making clear only their intent with regard to the availability of *cumulative* remedies in scheduled injury cases. 449 U.S. at 276, n. 14.[11]

In *PEPCO*, the Claimant, as in this case, incurred a permanent partial loss of the use of his leg, an injury specified in the statutory schedule. The ALJ, rather than awarding him compensation under the schedule, allowed him a larger recovery under § 8(c)(21), and the Benefits Review Board affirmed. The Court of Appeals also affirmed, concluding that the "all other cases" language in § 8(c)(21) provided a "remedial alternative" measure of compensation for cases in which the scheduled benefits failed adequately to compensate for a diminution in wage-earning capabilities.

---

[11]   In this case, the entitlement to *cumulative* remedies is at issue, rather than *alternative* statutory remedies, so the legislative history clearly prohibiting cumulative remedies is compelling. Congress simply did not intend wage loss benefits to be recoverable in any case involving a scheduled injury, after, or *in addition to*, the benefits recoverable under the Schedule, absent specific statutory revision of the Act.

The Court maintained that the legislature's adoption of a schedule of fixed benefits as an exclusive remedy in certain cases is consistent with the employees' interest in receiving a prompt and certain recovery for their industrial injuries as well as with the employers' interest in having their contingent liabilities identified as precisely and as early as possible. (*Id*.), at 280-284.

The Court held that the claimant's recovery for his leg injury, after MMI, was limited by the Schedule. (*Id*.), at 272-284. The Court held that on the question of the Schedule's exclusivity, the Act was plainly drafted, and no language in the Act supported an additional or alternative method for computing disability benefits in cases of permanent partial disability already provided for in the statutory schedule. (*Id*.), at 273-274, 276-80. The Court found the Act's legislative history to be entirely consistent with the conclusion that the Schedule precluded a subsequent, additional, or alternative recovery of indemnity benefits. (*Id*.), at 275-276.

The Court in *PEPCO* admonished the Benefits Review Board for artfully misreading the Act's plain language and diverging from long established precedent in a manner that rendered the Schedule no longer the exclusive remedy for claimants who had clearly scheduled injuries and permanent partial disability:

> During the first half century of administration of the LHWCA, federal tribunals consistently construed the schedule benefits provision as exclusive. Although the exclusivity question did not explicitly arise until 1964, prior to that time evidence of loss of wages or wage-earning capacity was considered irrelevant in cases of permanent

partial disability falling within the schedule provisions.  In 1964, in *Williams* v. *Donovan*, 234 F. Supp. 135 (ED La.), *aff'd*, 367 F.2d 825 (CA5 1966), *cert. denied*, 386 U.S. 977 (1967), the first federal court to address the exclusivity issue found that "the form and language of the Act" indicated that compensation under § 8 (c)(21) for loss of wage-earning capacity was not available in cases covered by the schedule.  234 F. Supp., at 139.  This construction of the Act went unchallenged for the next decade.

It was not until 1975 that the Benefits Review Board announced its dissatisfaction with the *Williams* construction of the statute and concluded that claimants suffering from a permanent partial disability may elect to proceed under either the schedule or § 8 (c)(21).  The Board has since applied its construction of the Act in a series of decisions of which the instant case is a member.  The divided opinion of the Court of Appeals is apparently the first and only federal court decision accepting that construction.  *The notion that the plain language of the LHWCA might not mean what it says is thus a relatively recent development surfacing for the first time almost 50 years after its enactment.  The relevant judicial authority prior to 1975, although not abundant, indicates that the schedule benefits were considered exclusive.*

(*Id*.) at 276-279 (footnotes omitted) (emphasis added).  The Board's misreading of the Act in this case – to allow concurrent temporary partial disability compensation in addition to a permanent partial award under the Schedule, despite the Act's clear design and Congressional intent – amounts to the same stratagem that the Supreme Court admonished in *PEPCO* and that this court rejected in *Rowe* and *Gilchrist*.  *See* discussion *infra*, Section III.

The Court in *PEPCO* noted that once permanency was established, permanent total disability from all work could later be compensated under section 8(a) of the Act; however, no question could exist that the availability of temporary

partial disability under the Act, are precluded by the Act's design. As for the idea of additional, or even alternative temporary or permanent **partial** disability compensation under the Act, the Court made quite clear that the Schedule was the claimant's **exclusive** remedy. (*Id*.) at 279, note 17. (emphasis added).

Under *PEPCO*, no question can exist that a claimant may not receive additional, cumulative, or greater compensation under the Act for an economic loss of wage earning capacity after the claimant's medical impairment due to injury has reached MMI and become permanent in nature, and partial in extent. *See Rowe v. Newport News Shipbuilding and Dry Dock Company*, 193 F.3d 836 (4th Cir. 1999); *Gilchrist v. Newport News Shipbuilding and Dry Dock Company*, 135 F.3d 915 (4th Cir. 1998).

### III. This Court Has Consistently Refrained From Obviating the Clear Holding in PEPCO.

In *Gilchrist v. Newport News Shipbuilding and Dry Dock Company*, 135 F.3d 915, 32 BRBS 15(CRT) (4th Cir. 1998), the claimant argued before this Court that an ALJ may award the Claimant a higher scheduled rating by considering the claimant's post-injury loss of wage earning capacity. Thus, the claimant argued that he was not seeking compensation for his claimed injury *in addition* to the Schedule, nor was he seeking *alternative* compensation under the Act – just a boost in the rating itself based upon economic loss of wages clearly due to injury. (*Id*.) at

917.  This Court decided that no matter what shape or form the question of wage

earning capacity loss came in before the court, it simply is not compensable for an

injury that by its permanent nature falls under the Act's Schedule:

> The Supreme Court held in *PEPCO* that the plain language in the Act
> provided a compensation schedule for 20 different specific injuries.
> *The additional subparagraph, § 8(c)(21) applied only to injuries not
> included within the list of specific injuries.  It was not intended to
> provide an alternative method of compensation for the cases covered
> in the preceding paragraphs*.  (*Id.*) at 274.  The Court held that these
> provisions were mutually exclusive and that injuries covered under the
> schedule award could not be pursued instead through § 8(c)(21) in an
> effort to obtain a higher award based on economic loss.

> Furthermore, the Supreme Court in *PEPCO* specifically rejected the
> argument that the anomalous results produced by requiring resort to
> the schedule permitted an alternate calculation.  "Unless an injury
> results in a scheduled disability, the employee's compensation is
> dependent upon proving a loss of wage-earning capacity; in contrast,
> even though a scheduled injury may have no actual effect on an
> employee's capacity to perform a particular job or to maintain a
> particular level of income, compensation in the schedule amount must
> be paid. Conversely, the schedule may seriously under compensate
> some employees . . . ."  (*Id.*) at 283.  The Supreme Court
> acknowledged the possibility of incongruous results but found that the
> compelling language of the statute produced them and could not be
> disregarded by the Court.  It specifically invited Congress to review
> the statutory compensation schedule.

> In the case before this Court, Gilchrist attempts to distinguish his
> argument from that which was rejected in *PEPCO* by claiming that he
> is not attempting to receive greater recovery under § 8(c)(21).

> Instead, Gilchrist argues that the ALJ properly failed to consider loss
> of wage earning capacity in translating Gilchrist's medical impairment
> into a disability rating under the schedule.

Although *PEPCO* does not address specifically Gilchrist's claim, as he is not seeking an alternative method of compensation calculation under § 8(c)(21), the substance of the opinion leads this Court to affirm the ALJ's opinion that *PEPCO* precludes in spirit the calculation method Gilchrist advocates. A contrary ruling would permit a claimant to benefit both from the presumptive disability period created by the schedule and from a demonstrated lower wage earning capacity like that required in § 8(c)(21), a result deliberately barred by the Supreme Court in *PEPCO*. In Gilchrist's case, had he been able to demonstrate no economic loss – i.e. finding alternative employment at comparable pay, he would still, according to the dicta in *PEPCO* be entitled to the same payment under the scheduled award assuming the same impairment.

135 F.3d at 918-19.

In *Rowe v. Newport News Shipbuilding and Dry Dock Company*, 193 F.3d 836 (4th Cir. 1999), the claimant injured his right knee and was paid a forty percent permanent partial disability for loss of use of the right leg. When he was subsequently temporarily disabled as a result of work unavailability and therefore a layoff, he sought increased compensation based on the temporary loss of wage earning capacity. This Court held that under the *PEPCO* decision a claimant could not claim under the Longshore and Harbor Worker's Compensation Act (Act), a subsequent loss of wage earning capacity once awarded compensation for a scheduled disability:

> **The issue in this case is whether an injured claimant under LHWCA may base his claim on economic factors when awarded compensation for a scheduled disability as set forth in the Act under 33 U.S.C. § 908(c)(1-20)**. This court addressed this same question in *Gilchrist v. Newport News Shipbuilding and Dry Dock Co.*,

135 F.3d 915 (4th Cir. 1998). In that case, the claimant injured his hands, and an order was entered by the Director of 10% permanent partial disability in each hand, a scheduled injury. Thereafter he claimed loss of wage earning capacity and sought increased benefits for that under LHWCA for the scheduled injury. Similar to the present case, the ALJ, affirmed by the Board, determined that under *Potomac Electric Power Co v. Director, OWCP (PEPCO)*, 449 U.S. 268, 66 L. Ed. 2d 446, 101 S. Ct. 509 (1980), he could not account for economic factors in calculating disability benefits when the medical impairment falls within the schedule provided in the statute at § 908(c)(1-20).

On review, the claimant asserted that the ALJ erred by not considering loss of economic wage earning capacity in denying his claim for increased benefits. We denied the petition for review in that case. In *PEPCO*, the Supreme Court clarified the distinction between scheduled injuries, for which the claimant is limited to the compensation provided in the statutory schedule, and injuries outside the schedule, for which § 908(c)(21) provides a potentially higher recovery by incorporating economic factors. *PEPCO*, 449 U.S. at 274. Thus, we held that the *PEPCO* decision precluded an increase in compensation, based on economic factors, beyond that provided in the permanent partial disability schedule of Section 908(c).

(*Id.*) at 837.

This case is not distinguishable from the most *essential* facts of PEPCO, or *Gilchrist* or *Rowe*, to the extent that the Court is faced in this case with a Claimant who had an established permanent partial disability under the Schedule after which he sought additional benefits outside the section 8(c) schedule (and outside section 8(a) for permanent total disability). It is *exactly* this kind of wage earning incapacity loss, due to a waxing or waning of an otherwise permanent condition, that the Act's Schedule was designed exclusively to compensate, regardless of

actual wage loss.  It is exactly this kind of additional compensation that the Act's

Schedule and the *PEPCO* decision have precluded for years as a matter of law, and

it is exactly the deviation from established precedent that the Supreme Court

addressed in *PEPCO*, that the present decision represents.

The binding precedent of the U.S. Supreme Court, and of this court's

decisions following that precedent, is dispositive:

> The doctrine of *stare decisis* constitutes "a natural evolution from the
> very nature of our institutions."  Lile, *Some Views on the Rule of Stare
> Decisis*, 4 Va. L. Rev. 95, 97 (1916).  It follows that "any departure
> from the doctrine of *stare decisis* demands special justification."
> *Arizona* v. *Rumsey*, 467 U.S. 203, 212 (1984).… "[W]e should not
> be…unmindful, even when constitutional questions are involved, of the
> principle of *stare decisis*, by whose circumspect observance the
> wisdom of this Court as an institution transcending the moment can
> alone be brought to bear on the difficult problems that confront us."
> *Green* v. *United States*, 355 U.S. 184, 215 (1957) (Frankfurter, J.,
> dissenting).

*Welch v. Texas Dep't of Highways & Public Transp*., 483 U.S. 468, 478-479

(1987).

**IV.  The Ninth Circuit's Decision In *Benge* Is Legally And Factually Distinguishable And In Any Event Contrary To Law.**

The Ninth Circuit's decision in *Pacific Ship Repair & Fabrication, Inc. v. Director, OWCP.*, 687 F.3d 1182 (9th Cir. 2012) ("*Benge*") is inapposite.  While factually and legally distinguishable from the present case, it represents a trend towards obviating the established and plain meaning of the Act, by permitting a party who has already established *permanent* impairment in the context of a judicial determination as a legal finding of fact, to "reclassify" falsely and artificially the true nature of a permanent medical impairment as being "temporary" in nature, in order to gain *additional* benefits (or in the *Benge* case, to avoid liability under the Act for compensation entitlement).

The *Benge* case did not involve the Act's Schedule or the question of the Schedule's exclusivity at all; instead, in *Benge*, the Claimant had been adjudged to be at MMI and permanently and partially disabled on the basis of a partial loss *in wage earning capacity* (under the "all other cases" provision in section 8(c)(21)), and the Employer had been found entitled to relief under section 8(f) of the Act, rendering the Special Fund (administered by the Director, OWCP) liable for compensation payments to the Claimant after 104 weeks.  (*Id.*) at 1184.

The Claimant in *Benge* encountered in the future, unlike the Claimant in this case, much more than a simple waxing and waning of symptoms.  Instead, she

required cervical fusion surgery and hospitalization for her neck impairment, making her previously adjudged "partial" wage loss, total in extent for a nine month period.

Normally, the Claimant would be entitled to *permanent* total disability under the Act unless and until the Employer could later show she had a partial wage earning capacity loss; however, the Special Fund contended that Ms. Benge's previously adjudged "permanent" medical impairment should be artfully "re-classified" as being "temporary," so that the Director, OWCP could shift liability for the nine months period back to the Employer. The Ninth Circuit agreed with the Agency's position in that regard – essentially maintaining that "permanent" does not really mean, "permanent" under the Longshore Act.

The decision in *Benge* is factually distinguishable to the extent he Claimant in this case did not experience a dramatic change in physical condition – in fact any change was due to problems with his opposite knee and was clearly fleeting in nature, lasting 10 and 5/7 weeks. The decision is legally distinguishable because it did not concern or consider the exclusive recovery under the Schedule proscribed by the Court in *PEPCO*. The decision was nevertheless frankly disingenuous.

Section 8(c)(21) of the Act specifically provides that an award of benefits for permanent partial disability benefits is "subject to reconsideration of the *degree* of such impairment by the deputy commissioner on his own motion or upon

application of any party in interest." 33 U.S.C. § 908(c)(21) (emphasis added). The only modification that exists by the terms of the statute is to obtain an award of greater permanent partial disability or permanent total disability.

The Claimant in this case argued that the statute allows for modification under section 8(c)(22) based upon a change of condition, but the statute also makes clear that while modification can be made with regard to the extent of "disability" (meaning that a worker's scheduled injury rating award may *increase* if the loss of use becomes permanently greater, or in an unscheduled injury/wage loss case, if his earning capacity permanently changes), once a *permanent partial disability* award is issued, only the extent (or "degree" of impairment) may be modified.

The truth in this case is that the Claimant's existing permanent disability waxed and waned, and that it was more impairing (due to an earlier injury) for a brief moment in time. If the physician in this case had made the Claimant's restrictions greater for an indefinite period of time, but nevertheless declared them as "temporary" and awaiting a new natural re-healing process, the Claimant would have sought and likely recovered under the Board's analysis temporary wage loss benefits indefinitely, and defied the very purpose of the Schedule, which is to compensate for *presumed* future wage loss benefits for the claimed injury, *in lieu of* compensation for actual wage loss benefits and certainly not *in addition to* such benefits.

29

It is – in the end analysis – intellectually dishonest to suspend an earlier stipulated fact or judicial termination upon which an award was based, and pretend that a claimant was temporarily *not* at maximum medical improvement and temporarily *not* permanently disabled due to a claimed injury.  It is – in the end analysis – double indemnity to compensate a claimant for additional wage loss after a judicial determination has already been made that he is *permanently* disabled due to an injury, and entitled to benefits that *presuppose* future wage loss.

The Benefits Review Board's decision in this case, essentially to reverse the ALJ is nothing short of a return to the state of affairs and law that existed before the *PEPCO* decision, when the irrational notion prevailed that the Claimant should be able to stack duplicative remedies under the Act, and when the administrative judiciary turned a blind eye to the fact that one provision was clearly designed to preclude others.

**V.    A Trend Toward Liberalizing and Extending Benefits To Injured Workers Cannot Be Accommodated Judicially When the Act Was Not So Designed.**

According to Larson's *Law of Workers' Compensation*, when a "clear cut" permanent impairment occurs to a scheduled member, "with no complications, many jurisdictions continue to hold that the schedule allowance for that member is exclusive.  Under these holdings, simple…loss or impairment of a hand, foot, leg, arm, or eye is compensated on the schedule value of the injured member, not on

percentage disability of the body as a whole or of 'general disability'" for loss of

wage earning capacity.  4 Larson's Workers' Compensation Law § 87.03 (footnotes

omitted).

The treatise cautions, however, that a judiciary "trend" still exists toward

abandoning the "exclusiveness" of compensation for scheduled injuries:

> Although it is difficult to speak in terms of a majority rule on this
> point, because of significant differences in statutory background, it can
> be said that at one time the doctrine of exclusiveness of schedule
> allowances did dominate the field. But in recent years there has
> developed such a strong trend in the opposite direction that one might
> now, with equal justification, say that the field is dominated by the
> view that schedule allowances should not be deemed exclusive.

4 Larson's Workers' Compensation Law § 87.04.

That a national trend again exists to change the original design of workers

compensation – which was a design to streamline payment of workers

compensation under a schedule by paying for a fixed, presumed loss of wage

earning capacity, but also to extend coverage for the "unscheduled" injury and

benefits for any actual loss of wage earning capacity – does not merit the decision

reached in this case.  The Supreme Court in *PEPCO* specifically addressed the issue

of judicial catering to national trends in the face of a statute otherwise designed :

> The lower court cited, and the respondents rely upon, the 'recent trend
> in workmen's compensation law away from the idea of exclusivity of
> scheduled benefits.'  196 U. S. App. D. C., at 421, 606 F.2d, at 1328.
> Although this 'trend' unquestionably exists, it is neither uniform nor
> based entirely on cases presenting issues comparable to the precise

issue before us.  More importantly, a proper understanding of the judicial role in this case reveals that the recent trend actually supports a literal reading of the federal statute.  Our task is to ascertain the congressional intent underlying the schedule benefit provisions enacted in 1927; we are not free to incorporate into those provisions subsequent state-law developments that we may consider sound as a matter of policy.  In attempting to ascertain the legislative intent underlying a statute enacted over 50 years ago, the view that once '[dominated] the field' is more enlightening than a recent state-law trend that has not motivated subsequent Congresses to amend the federal statute.  The once dominant view is entirely consistent with a literal reading of the Act.

449 U.S. 268, 279-280.  *See also Morrison-Knudsen Constr. Co. v. Director, OWCP*, 461 U.S. 624, 635-636 ("a comprehensive statute such as this Act is not to be judicially expanded because of "recent trends.").  *Potomac Electric Power Co. v. Director, OWCP*, 449 U.S. 268, 279 (1980).  There we recognized that the Act was not a simple remedial statute intended for the benefit of the workers.  Rather, it was designed to strike a balance between the concerns of the longshoremen and harbor workers on the one hand, and their employers on the other.  Employers relinquished their defenses to tort actions in exchange for limited and predictable liability.  Employees accept the limited recovery because they receive prompt relief without the expense, uncertainty, and delay that tort actions entail.  (*Id.*), at 282, and n. 24; H.R. Rep. No. 1767, 69th Cong., 2d Sess., 19-20 (1927); *cf.* S. Rep. No. 92-1125, p. 5 (1972)").

## **CONCLUSION**

The Petitioner-Employer respectfully submits that United States Supreme Court's precedent and the precedent of this Court must remain controlling before the Benefits Board and that these cases simply cannot be reconciled with the Board's holding in this case.  The BRB's decision should be vacated and the original ALJ's Decision of December 6, 2011 (JA 176-84) should be re-instated.


Respectfully submitted,

<div style="margin-left: 40%;">

HUNTINGTON INGALLS
INCORPORATED,

By: /s/ Jonathan H. Walker
                Of Counsel

</div>

Jonathan H. Walker, Esquire
MASON, MASON, WALKER AND HEDRICK, P.C.
11848 Rock Landing Drive, Suite 291
Newport News, Virginia  23606
(757) 873-3909  (Telephone)
(757) 873-1781  (Facsimile)

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

**Addendum Page**

*Potomac Electric Power Co. v. Director, OWCP*,
   449 U.S. 268 (1980)................................................................Add. 1

*Pacific Ship Repair & Fabrication, Inc. v. Director, OWCP.*,
   687 F.3d 1182 (9th Cir. 2012) ...............................................Add. 6

Longshore Act § 908.........................................................................Add. 8

## *Potomac Elec. Power Co. v. Dir.*

Supreme Court of the United States

October 8, 1980, Argued ; December 15, 1980, Decided

No. 79-816

### Reporter
449 U.S. 268; 101 S. Ct. 509; 66 L. Ed. 2d 446; 1980 U.S. LEXIS 57; 49 U.S.L.W. 4063

POTOMAC ELECTRIC POWER CO. v. DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, U.S. DEPARTMENT OF LABOR, ET AL.

**Prior History:** CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT.

**Disposition:** *196 U. S. App. D. C. 417, 606 F.2d 1324,* reversed.

## Case Summary

### Procedural Posture
Petitioner company sought review of a judgment of the United States Court of Appeals for the District of Columbia Circuit, which affirmed an administrative finding that calculated the amount of claimant's workers' compensation benefits for a permanent partial disability based on the actual impairment of wage-earning capacity caused by his injury and that ordered payment of benefits for the remainder of the claimant's working life.

### Overview
The claimant worked in the District of Columbia and was entitled to compensation under the Longshoremen's and Harbor Workers' Compensation Act (LHWCA). The ALJ allowed a larger recovery than authorized by the statutory schedule and ruled that claimant was not required to accept the specific amount authorized by §§ 8 (c)(2) and (19) of the LHWCA for the partial loss of the use of a leg, but instead could recover an amount based on the formula set forth in § 8(c)(21) for "all other cases." The ALJ's finding was affirmed by the benefits review board. On

appeal, the court reversed the appellate court judgment and ruled that claimant was entitled to compensation under the statutory schedule and could not elect to receive a larger recovery under § 8(c)(21). In so ruling, the court determined that (1) although Congress could surely authorize such an election, it has not yet done so, (2) the claimant's recovery was limited by the statutory schedule, and (3) sympathy was an insufficient basis for approving a recovery that Congress had not authorized.

### Outcome
The court reversed the appellate court judgment which affirmed an administrative finding that calculated the amount of claimant's workers' compensation benefits for a permanent partial disability based on the actual impairment of wage-earning capacity caused by his injury.

## LexisNexis® Headnotes

Admiralty & Maritime Law > Maritime Workers' Claims > General Overview

Admiralty & Maritime Law > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act

Workers' Compensation & SSDI > Maritime Workers' Claims > Compensability > General Overview

Workers' Compensation & SSDI > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act > General Overview

Workers' Compensation & SSDI > ... > Awards > Benefits > Disability Benefits

Workers' Compensation & SSDI > ... > Longshore & Harbor Workers' Compensation Act > Awards > Computation

*HN1* Under the Longshoremen's and Harbor Workers' Compensation Act (act), compensation for a permanent partial disability must be determined in one of two ways. First, if the injury is of a kind specifically identified in the schedule set forth in §§ 8 (c)(1)-(20) of the act, specifically *33 U.S.C.S. §§ 908 (c)(1)-(20)*, the injured employee is entitled to receive two-thirds of his average weekly wages for a specific number of weeks, regardless of whether his earning capacity has actually been impaired. Second, in all other cases, § 8 (c)(21), specifically *33 U.S.C.S. § 908 (c)(21)*, authorizes compensation equal to two-thirds of the difference between the employee's pre-injury average weekly wages and his post-injury wage-earning capacity, during the period of his disability.

Admiralty & Maritime Law > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act

Workers' Compensation & SSDI > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act > General Overview

Workers' Compensation & SSDI > ... > Awards > Benefits > Disability Benefits

*HN2* Section 8, as set forth in *33 U.S.C.S. § 908*, provides, in part, that compensation for disability shall be paid to the employee as follows: In case of disability partial in character but permanent in quality the compensation shall be 66 2/3 percent of the average weekly wages, which shall be in addition to compensation for temporary total disability or temporary partial disability paid in accordance with *§ 908(b)* or *§ 908(e)*, respectively, and shall be paid to the employee, as follows: (1) Arm lost, three hundred and twelve weeks' compensation. (2) Leg lost, two hundred and eighty-eight weeks' compensation. (3) Hand lost, two hundred and forty-four weeks' compensation. (4) Foot lost, two hundred and five weeks'

compensation, (5) Eye lost, one hundred and sixty weeks' compensation.

Admiralty & Maritime Law > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act

Civil Procedure > Pretrial Matters > Continuances

Workers' Compensation & SSDI > Benefit Determinations > Earning Capacity

Workers' Compensation & SSDI > Compensability > Course of Employment > General Overview

Workers' Compensation & SSDI > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act > General Overview

Workers' Compensation & SSDI > ... > Awards > Benefits > Disability Benefits

*HN3* Section 8, as set forth in *33 U.S.C.S. § 908*, provides, in part, that compensation for disability shall be paid to the employee as follows: In case of disability partial in character but permanent in quality the compensation shall be 66 2/3 percent of the average weekly wages, which shall be in addition to compensation for temporary total disability or temporary partial disability paid in accordance with *§ 908(b)* or *§ 908(e)*, respectively, and shall be paid to the employee, as follows: (18) Compensation for permanent total loss of use of a member shall be the same as for loss of the member. (19) Compensation for permanent partial loss or loss of use of a member may be for proportionate loss or loss of use of the member. (20) Proper and equitable compensation not to exceed $ 3,500 shall be awarded for serious disfigurement of the face, head, or neck or of other normally exposed areas likely to handicap the employee in securing or maintaining employment. (21) In all other cases in this class of disability the compensation shall be 66 2/3 percent of the difference between average weekly wages and wage-earning capacity thereafter in the same employment or otherwise, payable during the continuance of such partial disability, but subject to reconsideration of the degree of such

impairment by the deputy commissioner on his own motion or upon application of any interested party.

Admiralty & Maritime Law > Maritime Workers' Claims > General Overview

Admiralty & Maritime Law > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act

Workers' Compensation & SSDI > Maritime Workers' Claims > Compensability > General Overview

Workers' Compensation & SSDI > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act > General Overview

Workers' Compensation & SSDI > ... > Longshore & Harbor Workers' Compensation Act > Coverage & Definitions > Employers

Workers' Compensation & SSDI > ... > Longshore & Harbor Workers' Compensation Act > Coverage & Definitions > Status Requirement

*HN4* The District of Columbia Workmen's Compensation Act, D. C. Code §§ 36-501 to 36-504 (Supp. 1978), adopts the Longshoremen's and Harbor Workers' Compensation Act as the workmen's compensation law for the District of Columbia. Section 1 of the act, *D. C. Code § 36-501* (1973), provides: The provisions of ch. 18 of 33 U.S.C.S., including all amendments that may hereafter be made thereto, shall apply in respect to the injury or death of an employee of an employer carrying on any employment in the District of Columbia, irrespective of the place where the injury or death occurs; except that in applying such provisions the term "employer" shall be held to mean every person carrying on any employment in the District of Columbia, and the term "employee" shall be held to mean every employee of any such person.

Workers' Compensation & SSDI > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act > General Overview

*HN5* Under §§ 8 (c)(2) and (18), an employee suffering a total loss of the use of one leg is entitled to receive two-thirds of his average weekly wages for a period of 288 weeks. If an injury results in a partial loss of the use of a scheduled member, as in this case, § 8 (c)(19) provides that compensation is to be calculated as a proportionate loss of the use of that member.

Admiralty & Maritime Law > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act

Workers' Compensation & SSDI > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act > General Overview

*HN6* Section 8 (h) of the Longshoremen's and Harbor Workers' Compensation Act, as set forth in *33 U.S.C.S. § 908 (h)*, provides: The wage-earning capacity of an injured employee in cases of partial disability under subdivision (c)(21) of this section or under subdivision (e) of this section shall be determined by his actual earnings if such actual earnings fairly and reasonably represent his wage-earning capacity: Provided, however, that if the employee has no actual earnings or his actual earnings do not fairly and reasonably represent his wage-earning capacity, the deputy commissioner may, in the interest of justice, fix such wage-earning capacity as shall be reasonable, having due regard to the nature of his injury, the degree of physical impairment, his usual employment, and any other factors or circumstances in the case which may affect his capacity to earn wages in his disabled condition, including the effect of disability as it may naturally extend into the future.

Admiralty & Maritime Law > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act

Workers' Compensation & SSDI > Maritime Workers' Claims > Compensability > General Overview

449 U.S. 268, *268; 101 S. Ct. 509, **509; 66 L. Ed. 2d 446, ***446

Workers' Compensation & SSDI > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act > General Overview

*HN7* The Longshoremen's and Harbor Workers' Compensation Act *33 U.S.C.S. §§ 901-950*, must be construed in light of its humanitarian objectives, Noting a recent trend in workmen's compensation law away from the idea of exclusivity of scheduled benefits, the Court concluded that the "all other cases" language in § 8 (c)(21) provided a "remedial alternative" measure of compensation for cases in which "the scheduled benefits fail adequately to compensate for a diminution in wage-earning capabilities.

Governments > Legislation > Interpretation

Workers' Compensation & SSDI > Maritime Workers' Claims > Compensability > General Overview

Workers' Compensation & SSDI > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act > General Overview

*HN8* The language of the Longshoremen's and Harbor Workers' Compensation Act plainly supports the view that the character of the disability determines the method of compensation. Section 8 identifies four different categories of disability and separately prescribes the method of compensation for each. In the permanent partial disability category, § 8(c) provides a compensation schedule which covers 20 different specific injuries. Section 8(c)(21) applies to any injury not included within the list of specific injuries. There is no language § 8(c)(21) indicating that it was intended to provide an alternative method of compensation for the cases described in the preceding subparagraphs. Quite the contrary, by its terms, subparagraph (21) is applicable "In all other cases."

Admiralty & Maritime Law > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act

Workers' Compensation & SSDI > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act > General Overview

*HN9* In addition to permanent partial disability, the Longshoremen's and Harbor Workers' Compensation Act provides for permanent total, temporary total, and temporary partial disability. The remedies for permanent and temporary total disability, essentially two-thirds of the employee's average weekly wages during the period of the disability, are set forth in § 8, specifically *33 U.S.C.S. §§ 908 (a)* and *(b)*. The remedy for temporary partial disability, two-thirds of the difference between the employee's preinjury average weekly wages and his post-injury wage-earning capacity during the period of disability, up to a maximum of five years, is set forth in § 8(e), specifically *33 U.S.C.S. § 908 (e)*.

Admiralty & Maritime Law > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act

Workers' Compensation & SSDI > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act > General Overview

*HN10* Section 8(a), directs that permanent total disability shall be determined in accordance with the facts. *33 U.S.C.S. § 908(a)*. Since the § 8(c) schedule applies only in cases of permanent partial disability, once it is determined that an employee is totally disabled the schedule becomes irrelevant.

Admiralty & Maritime Law > Maritime Workers' Claims > General Overview

Admiralty & Maritime Law > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act

Governments > Legislation > Interpretation

Workers' Compensation & SSDI > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act > General Overview

449 U.S. 268, *268; 101 S. Ct. 509, **509; 66 L. Ed. 2d 446, ***446

**HN11** The Longshoremen's and Harbor Workers' Compensation Act shall be liberally construed in order to effectuate its remedial purposes.

Admiralty & Maritime Law > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act

Workers' Compensation & SSDI > Maritime Workers' Claims > Compensability > General Overview

Workers' Compensation & SSDI > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act > General Overview

**HN12** The concept of compromise is central to the Longshoremen's and Harbor Workers' Compensation Act, as adopted by the District of Columbia Workmen's Compensation Act. A prime purpose of the act is to provide residents of the District of Columbia with a practical and expeditious remedy for their industrial accidents and to place on District of Columbia employers a limited and determinate liability.

Admiralty & Maritime Law > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act

Governments > Legislation > Interpretation

Workers' Compensation & SSDI > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act > General Overview

**HN13** It is not to be lightly assumed that Congress intended that the Longshoremen's and Harbor Workers' Compensation Act produce incongruous results. But if "compelling language" produces incongruities, the federal courts may not avoid them by rewriting or ignoring that language.

Governments > Legislation > Interpretation

**HN14** The court's individual appraisal of the wisdom or lack of wisdom of a particular course consciously selected by Congress is to be put aside in the process of interpreting a statute. Once the meaning of an enactment is discerned and its

constitutionality determined, the judicial process comes to an end.

## Lawyers' Edition Display

### Decision

Worker entitled to compensation for permanent partial disability under schedule of LHWCA (*33 USCS 908(c)(1)-(20)*), held not entitled, as alternative, to larger compensation under provision for "all other cases" (*33 USCS 908(c)(1)(21)*).

### Summary

A worker in the District of Columbia who had an unquestioned right under the Longshoremen's and Harbor Workers' Compensation Act to an award measured by a fraction of his average weekly wages for 288 weeks because an injury to his leg was of the "permanent partial disability" character governed by 8(c) of the Act (*33 USCS 908(c)*)--the worker's injury falling within the compensation schedule of 8(c)(1)(20) of the Act (*33 USCS 908(c)(1)-(20)*) which covers specific injuries such as the one sustained by the worker--was allowed a larger recovery by an administrative law judge under the compensation formula set forth in 8(c)(21) of the Act (*33 USCS 908(c)(21)*) governing "all other cases," which authorizes compensation equal to two-thirds of the difference between an employee's preinjury average weekly wages and his postinjury wage-earning capacity, during the period of his disability. The Benefits Review Board affirmed (*7 BRBS 10*), as did the United States Court of Appeals for the District of Columbia Circuit, the Court of Appeals, after recognizing that the Act must be construed in light of its humanitarian objectives and after noting a trend in workers' compensation laws away from the idea of exclusivity of scheduled benefits, concluding that the "all other cases" language in 8(c)(21) of the Act provided a remedial alternative measure of compensation for cases such as that of the worker in the case at bar in which the schedule of benefits under 8(c)(1)-(20) fails to adequately

# *Pac. Ship Repair & Fabrication, Inc. v. Dir.*

United States Court of Appeals for the Ninth Circuit

March 13, 2012, Argued and Submitted, San Francisco, California; July 24, 2012, Filed

No. 11-70292

**Reporter**

687 F.3d 1182; 2012 U.S. App. LEXIS 15223; 2012 AMC 2184; 2012 WL 3004717

PACIFIC SHIP REPAIR AND FABRICATION INC., Petitioner, v. DIRECTOR, OFFICE OF WORKER COMPENSATION PROGRAMS; DEBORAH BENGE, Respondents.

**Prior History:** [**1] On Petition for Review of an Order of the Benefits Review Board. OWCP No. 10-0207.

**Disposition:** PETITION DENIED.

## Case Summary

### Procedural Posture

Benefits Review Board held respondent, a permanent partial disability employee under the Longshore and Harbor Workers' Compensation Act, *33 U.S.C.S. § 901 et seq.*, could be reclassified as temporarily totally disabled during a 9-month surgery recovery period, absolving respondent Director of the Office of Workers' Compensation Programs from making payments during that time and requiring payment by petitioner employer. The employer sought review.

### Overview

The employee had a partial permanent disability (PPD), and her condition continued to deteriorate. She then underwent surgery leaving her totally disabled. The 9-month total disability immediately following the surgery was temporary in nature. Characterizing her as temporarily disabled while she underwent a healing process comported with the view that a disability was temporary so long as there was a possibility or likelihood of improvement through normal and natural healing. Of course, the temporary nature of the disability would again transform to permanent status when

normal and natural healing was no longer likely. Assuming her underlying PPD was not expected to improve due to the surgery, she was temporarily totally disabled under because she lost all wage-earning capacity. The Director's position — that an award for total temporary disability trumped, or subsumed, an award for any underlying PPD — was reasonable. The prior PPD finding did not preclude a later finding of temporary disability for the same underlying injury during a period of recovery following surgery. The employer was responsible for the temporary total disability payments.

### Outcome

The petition was denied.

## LexisNexis® Headnotes

Admiralty & Maritime Law > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act

Workers' Compensation & SSDI > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act > Notice & Claim Periods

*HN1* The Longshore and Harbor Workers' Compensation Act establishes a federal worker's compensation system for employees disabled or killed in the course of covered maritime employment. It requires an injured worker's employer to pay all disability compensation owed to the employee, except in certain cases. Where a preexisting condition contributes to the employee's post-injury permanent disability, *33 U.S.C.S. § 908(f)* limits an employer's liability for post-injury permanent disability payments to 104 weeks. *33 U.S.C.S. § 908(f)*. Thereafter, based on this

preexisting injury exception, an industry-financed "special fund," administered by the Office of Workers' Compensation Programs, pays the remaining permanent disability benefits due. *33 U.S.C.S. § 908(f)*. This special fund does not pay temporary disability benefits, whether partial or total. *33 U.S.C.S. § 944*.

Admiralty & Maritime Law > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act

Workers' Compensation & SSDI > ... > Awards > Benefits > Disability Benefits

Workers' Compensation & SSDI > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act > Notice & Claim Periods

*HN2* Under the Longshore and Harbor Workers' Compensation Act, there are four different categories of disabilities: permanent total disability; temporary total disability; permanent partial disability; and temporary partial disability. *33 U.S.C.S. § 908(a)-(c)*, *(e)*. This statutory structure indicates two independent areas of analysis — nature (or duration) of disability and degree of disability. Temporary and permanent go to the nature of the disability. Total and partial go to the degree of the disability. This differentiation leads courts to find maximum medical improvement to be an indication of permanent versus temporary disability and availability of suitable alternative employment to be an indication of partial versus total disability.

Admiralty & Maritime Law > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act

Workers' Compensation & SSDI > ... > Awards > Benefits > Disability Benefits

Workers' Compensation & SSDI > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act > Notice & Claim Periods

*HN3* A disability is temporary under the Longshore and Harbor Workers' Compensation Act, *33 U.S.C.S. § 901 et seq.*, so long as there is

a possibility or likelihood of improvement through normal and natural healing. In other words, a disability remains temporary until the time the claimant reaches "maximum medical improvement," after which normal and natural healing is no longer likely. The maximum medical improvement date triggers a change in the classification of a claimant's disability from temporary to permanent.

Admiralty & Maritime Law > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act

Workers' Compensation & SSDI > ... > Awards > Benefits > Disability Benefits

Workers' Compensation & SSDI > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act > Notice & Claim Periods

*HN4* Re-characterization of a disability under the Longshore and Harbor Workers' Compensation Act, *33 U.S.C.S. § 901 et seq.*, may be necessary due to changed circumstances.

Admiralty & Maritime Law > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act

Governments > Legislation > Interpretation

Workers' Compensation & SSDI > ... > Awards > Benefits > Disability Benefits

Workers' Compensation & SSDI > Maritime Workers' Claims > Longshore & Harbor Workers' Compensation Act > Notice & Claim Periods

*HN5* The Longshore and Harbor Workers' Compensation Act permits the modification of a disability award order if the individual's condition changes over time. *33 U.S.C.S. § 922* states that within certain time limits, on the ground of a change in conditions, the Office of Workers' Compensation Programs' deputy commissioner may review a compensation case and issue a new compensation order which may terminate, continue, reinstate, increase, or decrease such compensation, or award compensation. If an

**§ 908. Compensation for disability**

Compensation for disability shall be paid to the employee as follows:

(a) Permanent total disability: In case of total disability adjudged to be permanent 66 2/3 per centum of the average weekly wages shall be paid to the employee during the continuance of such total disability. Loss of both hands, or both arms, or both feet, or both legs or both eyes, or of any two thereof shall, in the absence of conclusive proof to the contrary, constitute permanent total disability. In all other cases permanent total disability shall be determined in accordance with the facts.

(b) Temporary total disability: In case of disability total in character but temporary in quality 66 2/3 per centum of the average weekly wages shall be paid to the employee during the continuance thereof.

(c) Permanent partial disability: In case of disability partial in character but permanent in quality the compensation shall be 66 2/3 per centum of the average weekly wages, which shall be in addition to compensation for temporary total disability or temporary partial disability paid in accordance with subdivision (b) or subdivision (e) of this section, respectively, and shall be paid to the employee, as follows:

(1) Arm lost, three hundred and twelve weeks' compensation.

(2) Leg lost, two hundred and eighty-eight weeks' compensation.

(3) Hand lost, two hundred and forty-four weeks' compensation.

(4) Foot lost, two hundred and five weeks' compensation.

(5) Eye lost, one hundred and sixty weeks' compensation.

(6) Thumb lost, seventy-five weeks' compensation.

(7) First finger lost, forty-six weeks' compensation.

(8) Great toe lost, thirty-eight weeks' compensation.

(9) Second finger lost, thirty weeks' compensation.

(10) Third finger lost, twenty-five weeks' compensation.

(11) Toe other than great toe lost, sixteen weeks' compensation.

(12) Fourth finger lost, fifteen weeks' compensation.

(13) Loss of hearing:

(A) Compensation for loss of hearing in one ear, fifty-two weeks.

(B) Compensation for loss of hearing in both ears, two-hundred weeks.

(C) An audiogram shall be presumptive evidence of the amount of hearing loss sustained as of the date

U.S. Department of Labor - Office of Workers' Compensation Program...                    http://www.dol.gov/owcp/dlhwc/lhwca.htm

thereof, only if (i) such audiogram was administered by a licensed or certified audiologist or a physician who is certified in otolaryngology, (ii) such audiogram, with the report thereon, was provided to the employee at the time it was administered, and (iii) no contrary audiogram made at that time is produced.

(D) The time for filing a notice of injury, under section 12 of this Act [33 USC § 912], or a claim for compensation, under section 13 of this Act [33 USC § 913], shall not begin to run in connection with any claim for loss of hearing under this section, until the employee has received an audiogram, with the accompanying report thereon, which indicates that the employee has suffered a loss of hearing.

(E) Determinations of loss of hearing shall be made in accordance with the guides for the evaluation of permanent impairment as promulgated and modified from time to time by the American Medical Association.

(14) Phalanges: Compensation for loss of more than one phalange of a digit shall be the same as for loss of the entire digit. Compensation for loss of the first phalange shall be one-half of the compensation for loss of the entire digit.

(15) Amputated arm or leg: Compensation for an arm or a leg, if amputated at or above the elbow or the knee, shall be the same as for a loss of the arm or leg; but, if amputated between the elbow and the wrist or the knee and the ankle, shall be the same as for loss of a hand or foot.

(16) Binocular vision or per centum of vision: Compensation for loss of binocular vision or for 80 per centum or more of the vision of an eye shall be the same as for loss of the eye.

(17) Two or more digits: Compensation for loss of two or more digits, or one or more phalanges of two or more digits, of a hand or foot may be proportioned to the loss of use of the hand or foot occasioned thereby, but shall not exceed the compensation for loss of a hand or foot.

(18) Total loss of use: Compensation for permanent total loss of use of a member shall be the same as for loss of the member.

(19) Partial loss or partial loss of use: Compensation for permanent partial loss or loss of use of a member may be for proportionate loss or loss of use of the member.

(20) Disfigurement: Proper and equitable compensation not to exceed $ 7,500 shall be awarded for serious disfigurement of the face, head, or neck or of other normally exposed areas likely to handicap the employee in securing or maintaining employment.

(21) Other cases: In all other cases in the class of disability, the compensation shall be 66 2/3 per centum of the difference between the average weekly wages of the employee and the employee's wage-earning capacity thereafter in the same employment or otherwise, payable during the continuance of partial disability.

(22) In any case in which there shall be a loss of, or loss of use of, more than one member or parts of more than one member set forth in paragraphs (1) to (19) of this subdivision, not amounting to permanent total disability, the award of compensation shall be for the loss of, or loss of use of, each such member or part thereof, which awards shall run consecutively, except that where the injury affects only two or more digits of the same hand or foot, paragraph (17) of this subdivision shall apply.

(23) Notwithstanding paragraphs (1) through (22), with respect to a claim for permanent partial disability for which the average weekly wages are determined under section 10(d)(2) [33 USC § 910(d)(2)], the compensation shall be 66 2/3 per centum of such average weekly wages multiplied by the percentage of permanent impairment, as determined under the guides referred to in section 2(10) [33 USC § 902(10)], payable during the continuance of such impairment.

- Add. 9 -

U.S. Department of Labor - Office of Workers' Compensation Program...          http://www.dol.gov/owcp/dlhwc/lhwca.htm

(d)(1) If an employee who is receiving compensation for permanent partial disability pursuant to section 8(c)(1)—(20) [subsec. (c)(1)—(20) of this section] dies from causes other than the injury, the total amount of the award unpaid at the time of death shall be payable to or for the benefit of his survivors, as follows:

(A) if the employee is survived only by a widow or widower, such unpaid amount of the award shall be payable to such widow or widower,

(B) if the employee is survived only by a child or children, such unpaid amount of the award shall be paid to such child or children in equal shares,

(C) if the employee is survived by a widow or widower and a child or children, such unpaid amount of the award shall be payable to such survivors in equal shares,

(D) if there be no widow or widower and no surviving child or children, such unpaid amount of the award shall be paid to the survivors specified in section 9(d) [33 USC § 909(d)] (other than a wife, husband, or child); and the amount to be paid each such survivor shall be determined by multiplying such unpaid amount of the award by the appropriate percentage specified in section 9(d) [33 USC § 909(d)], but if the aggregate amount to which all such survivors are entitled, as so determined, is less than such unpaid amount of the award, the excess amount shall be divided among such survivors pro rata according to the amount otherwise payable to each under this subparagraph.

(2) Notwithstanding any other limitation in section 9 [33 USC § 909], the total amount of any award for permanent partial disability pursuant to section 8(c)(1)—(20) of [subsec. (c)(1)—(20) of this section] unpaid at time of death shall be payable in full in the appropriate distribution.

(3) An award for disability may be made after the death of the injured employee. Except where compensation is payable under section 8(c)(21) [subsec.(c)(21) of this section], if there be no survivors as prescribed in this section, then the compensation payable under this subsection shall be paid to the special fund established under section 44(a) of this Act [33 USC § 944(a)].

(4) [Redesignated]

(e) Temporary partial disability: In case of temporary partial disability resulting in decrease of earning capacity the compensation shall be two-thirds of the difference between the injured employee's average weekly wages before the injury and his wage-earning capacity after the injury in the same or another employment, to be paid during the continuance of such disability, but shall not be paid for a period exceeding five years.

(f) Injury increasing disability:

(1) In any case in which an employee having an existing permanent partial disability suffers injury, the employer shall provide compensation for such disability as is found to be attributable to that injury based upon the average weekly wages of the employee at the time of the injury. If following an injury falling within the provisions of section 8(c)(1)-(20) [subsec. (c)(1)-(20) of this section], the employee is totally and permanently disabled, and the disability is found not to be due solely to that injury, the employer shall provide compensation for the applicable prescribed period of weeks provided for in that section for the subsequent injury, or for one hundred and four weeks, whichever is the greater, except that, in the case of an injury falling within the provisions of section 8(c)(13) [subsec. (c)(13) of this section], the employer shall provide compensation for the lesser of such periods. In all other cases of total permanent disability or of death, found not to be due solely to that injury, of an employee having an existing permanent partial disability, the employer shall provide in addition to compensation under paragraphs (b) and (e) of this section, compensation payments or death benefits for one hundred and four weeks only. If following an injury falling within the provisions of 8(c)(1)-(20) [subsec. (c)(1)-(20) of this section], the employee has a

- Add. 10 -

U.S. Department of Labor - Office of Workers' Compensation Program...          http://www.dol.gov/owcp/dlhwc/lhwca.htm

permanent partial disability and the disability is found not to be due solely to that injury, and such disability is materially and substantially greater than that which would have resulted from the subsequent injury alone, the employer shall provide compensation for the applicable period of weeks provided for in that section for the subsequent injury, or for one hundred and four weeks, whichever is the greater, except that, in the case of an injury falling within the provisions of section 8(c)(13) [subsec. (c)(13) of this section], the employer shall provide compensation for the lesser of such periods. In all other cases in which the employee has a permanent partial disability, found not to be due solely to that injury, and such disability is materially and substantially greater than that which would have resulted from the subsequent injury alone, the employer shall provide in addition to compensation under paragraphs (b) and (e) of this section, compensation for one hundred and four weeks only.

(2)(A) After cessation of the payments for the period of weeks provided for herein, the employee or his survivor entitled to benefits shall be paid the remainder of the compensation that would be due out of the special fund established in section 44 [33 USC § 944], except that the special fund shall not assume responsibility with respect to such benefits (and such payments shall not be subject to cessation) in the case of any employer who fails to comply with section 32(a) [33 USC § 932(a)].

(B) After cessation of payments for the period of weeks provided for in this subsection, the employer or carrier responsible for payment of compensation shall remain a party to the claim, retain access to all records relating to the claim, and in all other respects retain all rights granted under this Act prior to cessation of such payments.

(3) Any request, filed after the date of enactment of the Longshore and Harbor Workers' Compensation Amendments of 1984 [enacted Sept. 28, 1984], for apportionment of liability to the special fund established under section 44 of this Act [33 USC § 944] for the payment of compensation benefits, and a statement of the grounds therefore, shall be presented to the deputy commissioner prior to the consideration of the claim by the deputy commissioner. Failure to present such request prior to such consideration shall be an absolute defense to the special fund's liability for the payment of any benefits in connection with such claim, unless the employer could not have reasonably anticipated the liability of the special fund prior to the issuance of a compensation order.

(g) Maintenance for employees undergoing vocational rehabilitation: An employee who as a result of injury is or may be expected to be totally or partially incapacitated for a remunerative occupation and who, under the direction of the Secretary as provided by section 39(c) of this Act [33 USC § 939(c)], is being rendered fit to engage in a remunerative occupation, shall receive additional compensation necessary for his maintenance, but such additional compensation shall not exceed $ 25 a week. The expense shall be paid out of the special fund established in section 44 [33 USC § 944].

(h) The wage-earning capacity of an injured employee in cases of partial disability under subdivision (c)(21) of this section or under subdivision (e) of this section shall be determined by his actual earnings if such actual earnings fairly and reasonably represent his wage-earning capacity: Provided, however, That if the employee has no actual earnings or his actual earnings do not fairly and reasonably represent his wage-earning capacity, the deputy commissioner may, in the interest of justice, fix such wage-earning capacity as shall be reasonable, having due regard to the nature of his injury, the degree of physical impairment, his usual employment, and any other factors or circumstances in the case which may affect his capacity to earn wages in his disabled condition, including the effect of disability as it may naturally extend into the future.

(i)(1) Whenever the parties to any claim for compensation under this Act, including survivors benefits, agree to a settlement, the deputy commissioner or administrative law judge shall approve the settlement within thirty days unless it is found to be inadequate or procured by duress. Such settlement may include future medical benefits if the parties so agree. No liability of any employer, carrier, or both for medical, disability, or

death benefits shall be discharged unless the application for settlement is approved by the deputy commissioner or administrative law judge. If the parties to the settlement are represented by counsel, then agreements shall be deemed approved unless specifically disapproved within thirty days after submission for approval.

(2) If the deputy commissioner disapproves an application for settlement under paragraph (1), the deputy commissioner shall issue a written statement within thirty days containing the reasons for disapproval. Any party to the settlement may request a hearing before an administrative law judge in the manner prescribed by this Act. Following such hearing, the administrative law judge shall enter an order approving or rejecting the settlement.

(3) A settlement approved under this section shall discharge the liability of the employer or carrier, or both. Settlements may be agreed upon at any stage of the proceeding including after entry of a final compensation order.

(4) The special fund shall not be liable for reimbursement of any sums paid or payable to an employee or any beneficiary under such settlement, or otherwise voluntarily paid prior to such settlement by the employer or carrier, or both.

(j)(1) The employer may inform a disabled employee of his obligation to report to the employer not less than semiannually any earnings from employment or self-employment, on such forms as the Secretary shall specify in regulations.

(2) An employee who —

> (A) fails to report the employee's earnings under paragraph (1) when requested, or
>
> (B) knowingly and willfully omits or understates any part of such earnings, and who is determined by the deputy commissioner to have violated clause (A) or (B) of this paragraph, forfeits his right to compensation with respect to any period during which the employee was required to file such report.

(3) Compensation forfeited under this subsection, if already paid, shall be recovered by a deduction from the compensation payable to the employee in any amount and on such schedule as determined by the deputy commissioner.

**Back to Top**

<u>**CERTIFICATE OF COMPLIANCE**</u>

1.  This brief complies with the type-volume limitation of Fed. R. App. P.
    28.1(e)(2) or 32(a)(7)(B) because:

    [ X ] this brief contains [*7,965*] words, excluding the parts of the brief
    exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [    ] this brief uses a monospaced typeface and contains [*state the number
    of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P.
    32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P.
    32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [ X ] this brief has been prepared in a proportionally spaced typeface using
    [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

    [    ] this brief has been prepared in a monospaced typeface using [*state
    name and version of word processing program*] with [*state number of
    characters per inch and name of type style*].

Dated: September 25, 2014            /s/ Jonathan H. Walker
                                                   *Counsel for Petitioner*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 25th day of September, 2014 I caused this Brief

of Petitioner and Joint Appendix to be filed electronically with the Clerk of the

Court using the CM/ECF System, which will send notice of such filing to the

following registered CM/ECF users:

Matthew W. Boyle
Mark A. Reinhalter
U.S. DEPARTMENT OF LABOR
N-2117
200 Constitution Avenue, NW
Washington, DC  20210
(202) 693-5658

*Counsel for Respondent Director,*
  *Office of Workers' Compensation Programs,*
  *United States Department of Labor*

Gregory E. Camden
MONTAGNA, KLEIN, CAMDEN, LLP
425 Monticello Avenue
Norfolk, Virginia  23510
( (757) 622-8100

*Counsel for Respondent Ricky N. Eason*

I further certify that on this 25th day of September, 2014, 2014, I caused the

required copies of the Brief of Petitioner and Joint Appendix to be hand filed with

the Clerk of the Court.

/s/ Jonathan H. Walker
*Counsel for Petitioner*